**ROBERTSHAW–FULTON CONTROLS
CO. v. PATROL VALVE CO.**

Civ. No. 25676.

United States District Court,
N. D. Ohio, E. D.

May 27, 1952.

Howard Burns, Cleveland, Ohio, Webb, Mackey & Burden, Pittsburgh, Pa., for plaintiff.

Richey & Watts, Cleveland, Ohio, for defendant.

JONES, Chief Judge.

This is an action for a declaratory judgment of invalidity and non-infringement of U. S. Letters Patent 2,185,421. Defendant, the owner of the patent by assignment from the joint-inventors, denies that it is invalid, and by way of counterclaim, charges the plaintiff with infringement and with violations of a license agreement, for which it seeks recovery of damages and royalties.

The case was referred to William L. West as Special Master to hear and consider all evidence and arguments pertaining to the issues, and to report his findings of fact and conclusions of law.

The Master's report, comprising 124 pages, was filed on June 11, 1951, and a supplemental report, covering the issues raised by the second counterclaim, was filed on July 11, 1951. The report includes 67 findings of fact and 33 conclusions of law.

Defendant has made numerous objections to the report and supplemental report, and in support thereof, it has filed briefs totalling 135 pages. In all, it assigns 113 errors. It further objects to the allowance of $23,-000 in fees, the compensation applied for by the Special Master.

Plaintiff objects only to the 26th finding of fact and the 6th conclusion of law. Its briefs comprise 82 pages.

Oral hearing on all objections was had on December 20, 1951. In ruling upon controverted findings of the Special Master the court is limited by Rule 53(e), Rules of Civil Procedure, 28 U.S.C.A., which states:

"In an action to be tried without a jury the court shall accept the Master's findings of fact unless clearly erroneous. * * *"

Findings and decisions by the Patent Office on matters in dispute are emphasized repeatedly. While the Court believes that such findings and decisions are persuasive, it nevertheless is under the duty to render an independent judgment on the issues which have been raised in this action.

The patent in suit relates to a thermostatically controlled "pilot cut-off" valve for use on gas burning appliances. The device is designed to automatically shut off the supply of gas to an appliance in the event the pilot light is extinguished, thus preventing injuries due to gas explosion or asphyxiation. (See Master's description of the device, pp. 3–4).

The patentees state that their valve can be adjusted so as to close upon the increase of heat, thus making it suitable for use in an oven regulator. The accused devices manufactured by plaintiff are oven regulators.

It is not seriously disputed that thermostatic devices combining a bulb or tip, a tube, an expansible bellows or diaphragm containing an expansible fluid, and "means actuated by the thermo-expansion of the fluid" were well known prior to the time the patentees began their work.

The Master in finding of fact 7 sets out examples of the prior art. This evidence supports his finding of fact 6 that the construction of the device was old. Therefore, invention, if any, resides in the "disclosure in such combination of chlorinated diphenyl and chlorinated diphenyl oxide as the particular thermo-responsive fluids which the patentees claim they found 'peculiarly adapted for high temperature work'" (FF 5), or possibly in the combination of such a thermo-sensitive fluid and a container "which is relatively stable to such fluid (at) relatively high temperatures". (Application, p. 1).

Coming now to a consideration of the specific issues which have been raised, I shall treat them only in a general way, giving primary attention to the objections which are interposed to the findings and conclusions of the Master.

■ 1. *Invention*:

The Master concludes that the patent in suit is invalid for lack of invention (CL 4). He bases this conclusion upon findings that the work of the patentees involved no more than routine technical skill, and that their device is a combination of old elements,

producing no new result or mode of operation. (FF 15, 17, 19, 20, 21 and 22). It is his view that it required no more than skilled laboratory experiments to determine that chlorinated diphenyl and chlorinated diphenyl oxide were suitable as fillers for thermostatic devices, in view of the fact that the requirements of a filler for high temperature thermostatic devices were known, and the properties of chlorinated diphenyl and chlorinated diphenyl oxide were known. (FF 11, 12, 15 and 17).

The findings of the Master on this issue are supported by the evidence, and he applies the recognized tests of invention. See Great A. & P. Tea Co. v. Supermarket Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Mandel Bros. v. Wallace, 335 U.S. 291, 69 S.Ct. 73, 93 L.Ed. 12; Sinclair & Carroll Co., Inc. v. Inter-Chemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644; Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58; Lincoln Eng. Co. v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008.

Observations by the United States Supreme Court in two of the above cited cases are apposite In Mandel Bros. v. Wallace, the court approves the view of the United States Court of Appeals for the Second Circuit, Wallace v. F. W. Woolworth Co., 133 F.2d 763, stated at page 295, of 335 U.S. and at page 75 of 69 S.Ct., as follows:

"* * * skillful experiments in a laboratory, in cases where the principles of the investigations are well known, and the achievement of the desired and requires routine work rather than imagination, do not involve invention.'"

In Sinclair & Carroll Co., Inc. v. Inter-Chemical Corp., the court expresses the further view that selecting a known compound to meet known requirements is not invention.

Defendant relies upon the presumption of patentability attaching to the grant of its patent and upon the commercial success of its devices. It also claims invention in a new mode of operation of its device, or in an improved operation.

Without reviewing the evidence it is sufficient to observe that, in my view, it overcomes the usual presumption attaching to the grant.

█ Respecting the commercial success of the patent device, there is some doubt that it enjoyed the degree of success claimed for it. In any event, commercial success without invention will not make for patentability. Great A. & P. Tea Co. v. Supermarket, supra.

The Master finds, contrary to assertions by defendant, that prior art devices operated in the higher temperature ranges. (Report, p. 25, FF 21). Invention, if any, therefore, must reside in an improved operation of the device.

█ While the Master recognizes that some improved results are shown by the patent device, he believes that they fall short of invention, (FF 20, 22, and 23), and properly applies the rule laid down by the Supreme Court that an improvement to obtain "the privileged position of a patent" must involve more ingenuity than the work of a mechanic skilled in the art. Cuno Corp. v. Automatic Devices Corp., supra. With this finding I agree.

### 2. Exhausted Combination:

The Master takes the position that the claims of the patent in suit are addressed to an exhausted combination, and are therefore invalid. (CL 5).

His views on this issue are supported by findings heretofore found not erroneous, and are in accord with applicable rules of law. See Lincoln Eng. Co. v. Stewart-Warner Corp., supra, and Bassick Mfg. Co. v. R. M. Hollingshead Co., 298 U.S. 415, 56 S.Ct. 787, 80 L.Ed. 1251.

### 3. Compliance with R.S. 4888:

R.S. § 4888, 35 U.S.C.A. § 33, requires the inventor to describe his device "in such full, clear, concise, and exact terms" as to enable a person skilled in the art to construct and practice the invention. It also requires the inventor to "particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery."

█ On the question of compliance with the statute, the Master concludes that the

claims of the patent are not invalid for failure to specify the material out of which the containers should be made (CL 6). However, with respect to the fillers, he concludes that the claims encompass inoperative materials and are therefore invalid for overclaiming the alleged invention. (CL 7) Both parties interpose objections to these conclusions.

Considering first the filler materials for the patent device, the various claims call for one of the halogenated diphenyls, one of the chlorinated diphenyls, chlorinated diphenyl, and chlorinated diphenyl oxide. The Master finds that not all of the materials which come within these classifications are operative in thermostatic devices of the kind disclosed in the patent. (FF 29) This finding supports his conclusion that with respect to the fillers, the inventors overclaim their invention. See Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672.

Defendant maintains that the disclosure of the material for the filler in the patent is sufficient. It asserts that all forms of chlorinated diphenyl and chlorinated diphenyl oxide when liquid are operative in the patent device and it points out that the claims and specifications call for a liquid filler, or for a "fluid", a term used interchangeably with, and meaning "liquid". The evidence does not support defendant's position, however. The Master finds that some forms of chlorinated diphenyl and chlorinated diphenyl oxide, even if liquid, are inoperative (FF 29). He bases this finding upon the work of the inventors in 1930 and upon inter-partes tests performed before trial. In my opinion, his finding is not erroneous.

Plaintiff in its only objection to the report controverts the Master's second conclusion on the question of compliance with the statute. It believes that the claims of the patent are invalid for failure to specify the materials out of which the containers should be made. It does not dispute the fact that nickel is referred to in the specifications as a suitable material for the container so that one skilled in the art could practice the invention. It contends, however, that the claims of the patent, apart from the specifications, should "particularly point out and distinctly claim" this "essential feature" of the alleged invention.

In the opinion of the Master, the precise invention which the patentees are claiming does not rest on the selection of a suitable material for the container. (Report p. 41). A review of the history of the patent lends support for his view.

The file wrapper shows that the Patent Office rejected a claim in the patent application which specified nickel, it being of the opinion that the use of nickel in thermostatic devices was old. It would appear, therefore, that the Patent Office did not intend to grant a monopoly covering the materials for the container.

In view of this history, the reference to a container in the patent claims should be construed to be "generic". So construed, the claims are not invalid for lack of definiteness in this feature of the combination. See Wm. B. Scaife & Sons Co. v. Falls City Woolen Mills, 6 Cir., 209 F. 210.

### 4. Anticipation:

The patent in suit was issued January 2, 1940 on an application filed February 16, 1935. This application is claimed by defendant to be a combination-in-part of an original application of March 24, 1932.

On February 5, 1934 an application was filed for a patent on the invention of Edward L. Fonseca, and U. S. Letters Patent 1,978,362 were issued to his assignee on October 23, 1934. The Fonseca patent covers a thermostatic regulator employing chlorinated diphenyl as the thermo-responsive fluid. The devices manufactured by plaintiff are similar to this device.

The Master concludes that the Fonseca patent anticipates claims 1, 2, 3, and 6 of the patent in suit because of the earlier filing date of the Fonseca application (CL 29). He further concludes that claims 4 and 5 of the patent in suit are not anticipated by Fonseca for the reason that these claims, in his opinion, are entitled to the filing date of the 1932 application in which chlorinated diphenyl oxide was disclosed. (CL 20, 21).

It is apparent that these conclusions are based upon a careful analysis of the evidence and upon adequate findings.

Defendant asserts that it is entitled to an effective date for claims 1, 2, 3, and 6 prior to the Fonseca filing date. It relies upon two propositions: (1) a reduction to practice by the joint inventors in 1930, and (2) equivalency of chlorinated diphenyl and chlorinated diphenyl oxide; the latter substance being the subject of claims 4 and 5 which the Master holds are entitled to the 1932 filing date.

In rejecting these propositions, the Master properly applies the controlling legal principles.

As the Master holds, field tests were necessary before there could be a reduction to practice in this instance. See Field v. Knowles, 183 F.2d 593, 37 C.C.P.A. (Patents) 1211; Muskat v. Schmelkes, 140 F.2d 984, 31 C.C.P.A. (Patents) 837; Oakes v. Martin, 129 F.2d 721, 29 C.C.P.A. (Patents) 1211. The Master imposes no requirement of evidence of commercial use to show a reduction to practice as defendant asserts.

The Master finds and concludes that chlorinated diphenyl and chlorinated diphenyl oxide are not substantially identical in performance and results when used as fillers in the patent device and are therefore not equivalents. (FF 58, CL 25). This finding under the evidence is not erroneous, and the conclusion accords with the patent rule of equivalents. See Graver Tank & Mfg. Co. v. Linde Air Products Co., supra.

Defendant argues alternatively that if its patent claims do not antedate the Fonseca patent, nevertheless that patent does not disclose an operative device and therefore cannot be an anticipation of the patent in suit.

The Master is of the opinion that the disclosures of the Fonseca patent are sufficient. He finds that a person skilled in the art could practice the Fonseca invention by making changes short of invention, using the specifications and disclosures as a guide. He further finds that the presumption of operativeness attaching to the grant has not been overcome by defendant's evidence.

There is no error in the Master's disposition of this issue. See Western States Machine Co. v. S. S. Hepworth Co., 2 Cir., 147 F.2d 345.

**5. Infringement:**

The Master concludes that claims 1, 2, 3 and 6 of the patent in suit, if valid, would be infringed by the thermostatic devices manufactured and sold by plaintiff, and claims 4 and 5 thereof would not be infringed. (CL 30).

His conclusion respecting claims 4 and 5 is based upon a finding that plaintiff does not use chlorinated diphenyl oxide in any of its devices. (FF 63).

In my opinion the findings and conclusions of the Master on this issue are well supported.

**6. The Issues Arising Under Defendant's Second Counterclaim:**

The issues arising under defendant's second counterclaim are covered by the supplemental report of the Special Master.

In its second counterclaim, defendant seeks to recover unpaid royalties allegedly due under a patent license agreement between the parties.

The Master finds it not disputed that plaintiff gave written notice of its intention to terminate the agreement pursuant to its terms, and that, thereupon, the license terminated effective March 1, 1948. (Supp. Report, p. 1).

Respecting the amount of unpaid royalties allegedly due from plaintiff to defendant for the period prior to the termination of the agreement on March 1, 1948, the parties have agreed that $1,507.39 is owing. (Supp.Report, p. 1). They are in serious disagreement, however, as to whether royalties are due under Section D, Paragraph 8 of the agreement on devices sold by plaintiff between March 1, 1948 and September 1, 1948. Defendant demands an accounting of such sales.

Section D, Paragraph 8 of the license agreement provides as follows:

"In the event of cancellation of this agreement, Fulton (plaintiff) shall have the right to complete any and all contracts for the sale of said patented devices that it may then have upon its books or that it has become obligated for, and may fabricate and sell such uncompleted parts of said devices as it may have on hand at such expiration

of this agreement, paying the same royalty as herein provided for, and provided such contracts and such sales shall be completed within six (6) months after such cancellation."

Defendant contends that this section constitutes a severable contract which was not terminated by the notice of plaintiff.

The Master takes a different view of the matter. He is of the opinion that Section D. Paragraph 8, was intended for the benefit and protection of the licensee in the event the license was cancelled by the licensor, and he holds that defendant can have no right to royalties under the agreement after the effective date of termination when it was terminated by the licensee (plaintiff). (Supp.Report, pp. 2–3).

It is my considered judgment that the conclusion of the Master should be adopted. I think the evidence is persuasive that it was the intention of plaintiff to get out from under the agreement and to risk a suit for infringement. Such intention was effectively communicated to defendant. It negatives any idea that plaintiff was exercising its option under the agreement.

The foregoing represents a response to the more important issues which have been raised in this action and which are dealt with in the Master's report and supplemental report. The discussion is by no means exhaustive, however, of all the issues of law and fact. This is not required since the Master's findings and conclusions are to be deemed correct unless they are shown to be clearly erroneous.

All objections to the report and supplemental report will be overruled and the reports confirmed. The findings and conclusions of the Special Master are approved and adopted by the Court. Judgment may be entered for plaintiff on its claim, and for defendant in the sum of $1,507.39, with interest, on its second counterclaim.

Memorandum on objections to allowance of compensation:

On the application for and objection to the compensation requested by the Master it must be said that his report evidences services of an exceptionally high order; a thoroughness and intelligent response to the complex problems involved in the litigation.

If the services had been performed under circumstances of private contract the sum requested would not be beyond a fair and reasonable appraisal; but it has been the long established practice of the court in appraising services performed for the court to view the charges for such services by a somewhat different measure.

The court sitting in equity does not feel at liberty to allow compensation to be paid by litigants upon the same basis as might be the case in private relationship. This is not to reflect upon the excellent character of the services or the value of the extended time spent in deciding and reporting the case. The sole consideration is with the method of admeasuring the relative value to be attached to public, as compared with private, employment. While the court does not intend to direct the following criticism particularly to the parties here, yet it has been the observation and experience of many years in the case of references, that counsel generally seem somewhat over-zealous in presenting evidence to support their cause, without the considerate regard for time and expense as would be the case in the trial before the court, where the limiting hand of the judge gives some curtailment and finality to the reception of cumulative evidence. In such case the extending of the record before the Master is out of all proportion to the needs.

The reference by counsel for defendant to allowances in important cases before C. D. Friebolin and W. B. Woods, some years ago, are not precisely comparable or apposite. Both Mr. Friebolin and Mr. Woods were referees in bankruptcy and as such received fees in bankruptcy matters both as referees and as special masters. They and their offices were well equipped to handle such matters and, in addition, the judges felt more at liberty to use their services, although fully qualified, upon a reduced scale of charges and this because they were already in the public service and their disposition of references other than bankruptcy was regarded as additional service for the convenience of the court of equity. Based upon the then standards of private employment contract for professional services, the allowances were, by comparison, considerably undervalued.

It is my considered judgment that an allowance of compensation to the Master, fairly appraised under all the circumstances herein mentioned, would be $18,000.

Had this case not been referred to a Master it is extremely doubtful whether it yet would have been tried by the court, due to the extra burden put upon two judges and the consequent accumulation of business resulting from a two-year vacancy in the court. The reference, in addition to relieving the court, was in the interest, and for the convenience of, both parties who were anxious to have their case tried.

It is my judgment, upon equitable considerations, that each of the parties should contribute to the expense of the Master, the reference being, as I have stated, in the interest and for the convenience of both.

The action of the court in dividing the expense of the Master is not based upon the fact that the defendant pressed hard for a reference, whereas the plaintiff, although at first objecting to the reference, finally agreed to it. The action of the court is taken upon equitable grounds, as stated above. Both parties profited by an earlier disposition of their case than otherwise would have been possible. Thus, there seems to me to be every just reason why the parties should share in the expense of the Master.

Accordingly, $13,000 of the allowance to the Master will be assessed as costs against the defendant, and $5,000 of the allowance assessed as costs against the plaintiff.