ARKIE LURES, INC.,
Plaintiff/Counterclaim
Defendant,

v.

GENE LAREW TACKLE, INC.,
Defendant/Counterclaim
Plaintiff,

v.

Bob D. CARNES, Counterclaim
Defendant.

Civil No. 95–5037.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Jan. 23, 1996.

Boyd D. Cox, Fayetteville, AR, Michael Mashburn, Timothy Brooks, Mashburn & Taylor, Fayetteville, AR, for Plaintiff/Counterclaim Defendant.

Tom Mars, Everett, Shemin, Mars & Stills, Fayetteville, AR, J. Warren Jackman, Randall G. Vaughan, Gary Peterson, Tulsa, OK, for Defendant.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

Plaintiff Arkie Lures, Inc. ("Arkie Lures") filed this declaratory judgment action seeking to invalidate U.S. Patent No. 4,530,179 ("the Larew patent"). In the alternative, Arkie Lures seeks a declaration that it has not infringed the Larew patent. In response, the owner of the challenged patent, Gene Larew Tackle, Inc. ("Gene Larew"), has filed a counterclaim for patent infringement against Arkie Lures and its president, Bob Carnes.

Currently before the court is Arkie Lures' motion for summary judgment. Arkie Lures contends that the Larew patent is invalid as

a matter of law under 35 U.S.C. § 103 (West Supp.1995), which provides that a claimed invention is not patentable if it "would have been obvious at the time the invention was made to a person having ordinary skill in the art." This motion will be granted.

## I. BACKGROUND

The Larew patent is for an invention by Gene Larew entitled the "salt-impregnated fishing lure." The salty lure is like a normal lure in that it is comprised of three main parts: (1) a body part in the shape of a small-bodied animal such as a frog, lizard or worm; (2) a hook part to catch fish; and (3) an attachment part for connecting the lure to the fishing line. What is unique about the salty lure is that its body part is impregnated with salt sufficient to impart a salty taste.

Body parts for salty lures are made with well-known and widely-used technology. A certain liquid substance, often called plastisol, is injected into a mold in the shape of a soft-bodied animal. The mold is then heated until the liquid plastisol becomes a gelatinous solid. To impart a salty taste to the body part, Gene Larew takes the presumptively novel step of adding large quantities of salt to the plastisol liquid prior to injecting it into the mold.

The supposed benefit of a salty lure is that certain species of fish (including bass) apparently find the salt taste pleasing and will hold onto the lure longer. An added benefit is that the salty taste lasts for the life of the lure. With other salty fish attractants, such as pork rinds, their potency diminishes over time. For this invention, Gene Larew obtained the Larew patent.

## II. VALIDITY

The federal patent statutes were enacted pursuant to a specific constitutional provision which authorizes Congress "To promote the Progress of ... useful Arts, by securing for limited Times to ... Inventors the exclusive Right to their ... Discoveries." U.S. Const. art. I, § 8, cl. 8.

Under this clause, patents are not to be granted too freely, because the "grant of an exclusive right to an invention [is] the cre-ation of society—at odds with the inherent free nature of disclosed ideas—and [is] not to be freely given." *Graham v. John Deere Co.*, 383 U.S. 1, 9, 86 S.Ct. 684, 689, 15 L.Ed.2d 545 (1965). In order to be "worth to the public the embarrassment of an exclusive patent," a claimed invention must meet several conditions of patentability. *Graham*, 383 U.S. at 9, 10–11. First, the claimed invention must be "new," and second, it must be "useful." 35 U.S.C. § 101 (1984); *Graham*, 383 U.S. at 12. Third, in addition to being new and useful, a claimed invention must advance the useful arts in a way that would not "have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103.

On summary judgment, Arkie Lures focuses on the requirement of non-obviousness and claims that the salty lure fails to meet that condition of patent validity as set forth in 35 U.S.C. § 103, which provides as follows:

> **§ 103. Conditions for patentability; non-obvious subject matter**
>
> A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103.

> In decisions heretofore, this third factor has been designated by courts by various phrases. Thus, it has been referred to as: the exercise of the inventive faculty, the creative faculty, the inventive skill or the inventive effort, the creative work of the inventive faculty, the flash of creative genius, patentable novelty, patentable invention, and most often simply as "invention."

2 ERNEST BAMBRIDGE LIPSCOMB III, LIPSCOMB'S WALKER ON PATENTS, § 6:16 at 85 (3d ed. 1985).

According to the Supreme Court, the question of "obviousness" under § 103 is to be resolved in the following manner.

> (1) "the scope and content of the prior art are to be determined;"

(2) "differences between the prior art and the claims at issue are to be ascertained;"

(3) "and the level of ordinary skill in the pertinent art resolved."

*Graham,* 383 U.S. at 17, 86 S.Ct. at 693.

■ Also, "secondary considerations [such] as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." *Id.* at 17–18, 86 S.Ct. at 693–94. However, secondary considerations are just that—secondary. They cannot make a clearly unpatentable product patentable. *Anderson's–Black Rock, Inc. v. Pavement Salvage Co.,* 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969).

### III. SUMMARY JUDGMENT STANDARD

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there exists no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

In determining whether there are any genuine issues of material fact, the court must first give the nonmoving party "the benefit of the reasonable inferences that can be drawn from the underlying facts." *Fischer v. NWA, Inc.,* 883 F.2d 594, 598 (8th Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990). The court may then grant the motion for summary judgment only "if the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ In patent litigation, certain special considerations must be taken into account on summary judgment. First, since the issue of patent validity is a question of law, it may be ruled upon on summary judgment. *See Paragon Podiatry Lab., Inc. v. KLM Lab., Inc.,* 984 F.2d 1182, 1184–85 (Fed.Cir.1993); *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.,* 758 F.2d 613 (Fed.Cir.1985), *cert. dismissed,* 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985). This includes the issue of whether a claimed invention is unpatentable due to obviousness under § 103. *Ryko Mfg. Co. v. Nu–Star, Inc.,* 950 F.2d 714, 716 (Fed.Cir.1991); *See also* 2 Ernest Bambridge Lipscomb III, Lipscomb's Walker on Patents, § 6:14 (3d ed. 1985). However, summary judgment will not be proper if the "underlying factual considerations" that form the basis of the conclusion of law are in dispute. *Paragon,* 984 F.2d at 1186.

■ Second, since Arkie Lures has the burden of proving the "underlying facts" of patent invalidity by clear and convincing evidence, *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.,* 730 F.2d 1452, 1459 (Fed.Cir.1984), this court must take this heavy burden into account on summary judgment. *Liberty Lobby,* 477 U.S. at 254, 106 S.Ct. at 2513 ("in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden"). Thus, to grant summary judgment, this court must find that a reasonable person is required, as a matter of law, to find clear and convincing evidence of the "underlying facts" necessary to sustain summary judgment for Arkie Lures.[1]

### IV. THE PRIOR ART

■ First, it is clearly and convincingly established as a matter of law that people skilled in the art of making fishing lures are aware that fish have keen senses of smell and taste. For instance, in a 1972 article entitled, "Spice Up Your Lures," the author counsels fisherman that "fish depend heavily on their senses of sight and hearing, smell **and** taste," and that the smart fisherman will

---

1. Clear and convincing evidence has been described as evidence which proves in the mind of the trier of fact an abiding conviction that the truth of the factual contentions is highly probable. *Intel Corp. v. U.S. Intern. Trade Comm'n,* 946 F.2d 821, 830 (Fed.Cir.1991).

make a much greater effort to "consider smell **and** taste." Richard Martin, *Spice Up Your Lures,* OUTDOOR LIFE, December 1972 at 80 (Pl.Ex. F) (emphasis supplied). The article continually refers to "smell and taste" together as would be expected by any lay person. Moreover, the author discusses the fact that many fish have "taste buds ... along the body clear back to the tail." *Id.* at 82. He also refers a number of times to experiences where "fish were mouthing the lure to see if it was edible before making that final gulp." *Id.* at 126. He comments that "most fish have sensitive taste and smell organs" and are able "to detect salt and sugar in truly minuscule amounts." *Id.* This leads to his conclusion that "if the lure is spiced up with an attractor, the fish will be induced to hold the [lure] just a second longer, enough to give the angler an even chance." *Id.* at 127.

Second, it is clearly and convincingly established as a matter of law that the principle that salt is a fish attractant has been long-known to those skilled in the art of making fishing lures. For instance, in a book entitled *Modern Book of the Black Bass* by Byron Dalrymple (1972), the author goes on at length about the "science of scent fishing" and specifically the attractive qualities of salt. (Pl.Ex. E).

> Salt is definitely an attractor. This is thought to be the reason that solutions used to preserve such items as pork rind, which contain much salt, are actually an attractor. I have caught dozens of bass with fly-fishing tackle using a small strip of pork rind taken from a salt solution and impaled on a bare hook. I have watched many of them take the lure. They approach, appear to sniff or evaluate it, then inhale it. Salt, I am convinced, is the reason.
>
> \* \* \* \* \* \*
>
> Some of this knowledge will suggest to a bass fisherman what to do and what not to do.

*Id.* at 90–91. The author also discloses that most fish are extremely sensitive to the relative salinity of the water. *Id.; see also* THE 1974 SPORTS AFIELD ALMANAC (Ted Kesting ed., 1974) (almanac entry entitled "Salted Dynamite for Lunker Trout") (Pl.Ex. G).

The principle that salt is an attractant is also easily seen in Patent 3,079,722 ('722) which was issued on March 5, 1963. The invention is a fishing lure which has an inner core of squirrel hair with yeast and salt baked into it. When in use, water seeps through the outer shell to the inner core, which in turn emits a "peculiar odor which is very effective in attracting fish to the lure." (Pl.Ex. D, column 2, Line 20–25). To preserve the attractant qualities of the inner core, the inner core is designed so that "emission of odor decreases and ceases as the lure becomes dry, but becomes effective again during subsequent immersions, so that the odor producing effectiveness of the lure is not wasted while not in use." (Pl.Ex. D, column 2, lines 25–30).

The principle that salt is an attractant that works on the sense of taste is also clearly and convincingly established in the prior art by Patent 2,979,778 ("the Simons patent") which was issued on April 18, 1961. The invention is a fishing lure made of plastisol where fish attractant has been added to the liquid plastisol prior to injecting it into the mold. Part of the object of the Simons patent is to make a plastisol bait that operates on the fish's sense of **taste.**

> An object of the present invention is to provide a method for making an artificial lure having an odor and texture that duplicates, as nearly as possible, the odor and texture **or taste** of natural bait.
>
> \* \* \* \* \* \*
>
> At least part of the success of the bait appears to be attributable to the fact that fish are not discouraged by one nibble, but return in an effort to consume the entire bait. This is probably attributable to the fact that the texture of the plastic body simulates the **taste** of the nymph, while the attractant simulates its odor.

(Pl.Ex. A, Simons patent, column 1, lines 40–45, & column 2, lines 40–55) (emphasis supplied). Also, one of the benefits sought by the Simons patent is that the "fish attractant material ... remains active over a long period of time" and the lure "retains its potency

during the useful life of the lure." *Id.* (column 1, lines 45–50, 55–60).

The principle that fish attractants operate on a fish's sense of taste is also clearly and convincingly established in the prior art by Patent 3,579,895 ("the Orn patent") issued May 25, 1971. (Pl.Ex. A, Orn patent). Like the Simons patent, the Orn patent is a fishing lure made of plastisol where fish attractant has been added to the liquid plastisol prior to injecting it into the mold. The main novelty is the discovery of a process where the lure is made to look like a cluster of eggs. Like the Simons patent, the Orn patent depends on fish attractant for the effectiveness of the lure, an object of the patented process is to simulate "the flavor **or** odor of natural bait" through the use of "odorants, colorants **and/or** flavorants." *Id.* (column 1, lines 50–55, 55–60) (emphasis supplied).

## V. DIFFERENCES BETWEEN SUBJECT MATTER AND PRIOR ART

Gene Larew has admitted that "there is nothing patentably novel about [the] plastisol formulations, other than the addition of salt to them." (Pl.Ex. A, Amendment 10/6/83 at p. 3). However, he contends that his invention is significantly different from prior art and non-obvious for four reasons. The court will deal with these four reasons in turn.

### a. Operation Exclusively on Sense of Taste

First, Gene Larew claims that his product is not obvious, because the addition of salt "does not attract fish by an odor, but rather is 'taken by a striking fish for a longer period of time than previously known lures, thereby increasing the chance to hook the fish before it rejects the bait.'" *Id.* at p. 4. Larew contends that the non-obviousness of using taste as an exclusive attractor is borne out by the Simons patent which counsels against using non-soluble attractants such as salt, because they would not leach out into the water in great enough quantities to attract fish. *See* (Pl.Ex. A, Simons patent, column 3, lines 39–40).

The court disagrees that the plastic-insolubility of salt renders using it as an attractant in plastisol non-obvious. As described on the section on prior art, many makers of fish lures have commented on or assumed the close relationship between the sense of smell and taste. They have also commented on the fact that a good lure flavor can make the fish hold onto the lure for extra time and give the fisher more time to hook it. In other words, those familiar with the prior art were fully aware that fishing lures are effective, at least in part, based on their flavor.

Although the Simons patent teaches against using non-soluble attractants, the fact remains that the senses of taste and smell are closely related, and that those familiar with the prior art thought this obvious, and thought it obvious that taste was as important as smell. This fact is not changed just because the Simons patent states its technical judgment that it is better to use attractants that can operate by odor as well as taste.

### b. Indefinite Retention of Taste

The second reason that Gene Larew believed his new product was not obvious and could not have been easily developed by those skilled in the prior art is because "'the lure does not exude salt, and therefore retains its taste indefinitely.'" (Pl.Ex. A, Amendment 10/6/83 at p. 4). The court disagrees. While it is an obvious benefit to have an attractant that lasts over the useful life of the lure, that fact has been recognized as a benefit of the plastisol process at least since the Simons patent. (Pl.Ex. A, Simons patent, column 1, lines 45–50, 55–60) ("fish-attractant material ... remains active over a long period of time" and the lure "retains its potency during the useful life of the lure.").

### c. Safety Concerns

The third reason that Gene Larew does not think his product obvious is that people skilled in the art of making lures did not think it safe to mix salt with the plastisol. As evidence of this belief, he provides the testimony of Hugh Harville who made the prototypes of Gene Larew's salt-impregnated lures and testified that he was wary that the salt might make the machine blow up, be-

cause "[he] didn't know what to mix salt with plastic was going to do because you're not supposed to mix any foreign chemicals with the plastic." (Arkie Lures Ex. 10, p. 33; *see also* Arkie Lures Ex. 10, pp. 39–40).

It is obviously wise for people in the industry to proceed carefully when they are trying to add some new chemical attractant to a plastisol fishing lure. However, the whole concept of the impregnated plastisol lure, as invented by the Simons patent, is that you have to add foreign substances to the plastisol. Also, the court considers it clearly established as a matter of law that, prior to issuance of the Larew patent, at least some parties specifically used salt as a filler in plastisol lures. For instance, the record clearly reflects as a matter of law that William Edward Chambers, owner of various lure manufacturing companies since 1976, began adding salt to his lures as early as 1977 "strictly for a filler." Also, the record clearly reflects as a matter of law that Steve Sims, the owner and president of Sims Bait Manufacturing Company, put a "couple of handfuls" in a five to ten gallon pot of plastisol which Sims said was to keep the mold from sticking.[2] In other words, there is nothing to indicate that salt was any more dangerous to add to plastisol than any other attractant one familiar with the prior art might add to a plastisol lure.

### d. Adverse Effects of Salt on Plastisol

The final reason that Larew contends that it was not obvious to add salt to plastisol was because of the adverse effect that salt was expected to have on the properties of plastic, because salt roughens the texture of the lure, makes it more susceptible to tearing, and reduces the action on the lure. These would undoubtedly be thought of as drawbacks to using salt as an attractant in a plastisol lure. However, to say that they were thought of as drawbacks by people familiar with the prior art presumes that using salt in plastisol lures was an obvious possibility.

The fact that Larew was the first to try this obvious possibility and found that there is more consumer demand than one might think does not mean he was being inventive. He simply made a technical judgment that any craftsmen familiar with the prior art might make. There are only so many attractants that can be tried in a plastisol lure, and Gene Larew does not get a patent on using salt just because he tried salt and made a commercial success of it before anyone else. *See Ling–Temco–Vought, Inc. v. Kollsman Instrument Corp.*, 372 F.2d 263, 267 (2d Cir. 1967) (doctrine of "substitution of equivalents" provides that a product that merely substitutes one material for another is not patentable when the substituted material performs in a predictable manner because of its well-known properties); *Griffith Rubber Mills v. Hoffar*, 313 F.2d 1, 3–4 (9th Cir. 1963) (accord). *See generally* 60 Am.Jur.2d, *Patents* § 159 (1987).

### e. Secondary Considerations

Larew also points to objective evidence of non-obviousness, such as his product's rapid commercial success, the fact that others have copied his product, and the fact that others have obtained licenses from him to manufacture his patented product. These facts are considered established on summary judgment. However, secondary considerations are just that—secondary. They cannot make a clearly unpatentable product patentable. *Anderson's–Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969).

█ Since the product was clearly obvious and unpatentable as a matter of law based on the undisputed facts, the secondary fact that his product was commercially successful makes him an astute businessman, not an inventor. The fact that others copied his product simply means that others wanted to make money off his product too. The fact that some obtained a license to do so simply

---

**2.** In an order dated 11/17/95, this court held that there was no clear and convincing evidence, at least not as a matter of law on summary judgment, that Steve Sims and William Edward Chambers had made salt-impregnated lures with salt sufficient to impart a salty taste. On the other hand, the record is clear and convincing as a matter of law that people were using salt in their plastic lures. The only question on summary judgment was whether they were using it as a filler or to impart a salty taste.

**428**

shows the impact on the market that obtaining a patent with its presumption of validity can have. None of this changes this court's conclusion of law that Larew's product is obvious and not patentable.

## VI. CONCLUSION

For the reasons stated above, summary judgment will be granted. Larew does not effectively contest the fact that the principles upon which his product is based are well-known from the prior art. He also does not effectively contest that these principles have been applied to manufacture of various lures. There are salty lures and plastisol lures that operate on the basis of taste. There are salty lures and plastisol lures that retain their attractant qualities for the life of the lure. It seems quite obvious that salt could be used as the attractant in a plastisol lure.

It will not be necessary for the court to consider Arkie Lures' other argument on summary judgment that Gene Larew engaged in inequitable conduct as a matter of law in obtaining the Larew patent, and that said inequitable conduct rendered the patent invalid as a matter of law. The court also does not consider it necessary to consider Arkie Lures' renewed argument that the Larew patent was invalid as a matter of law under § 102, because the claimed invention was "on sale" or "in public use" more than a year before the filing of the patent application. An appropriate order and judgment will be entered concurrently with this memorandum opinion.

### *ORDER AND JUDGMENT*

On this 23rd day of January 1996, upon consideration of Arkie Lures' motion for summary judgment, the court finds, for reasons stated in a memorandum opinion of even date, that said motion should be and hereby is granted. It is hereby declared that U.S. Patent No. 4,530,179 is invalid. This case is hereby dismissed.

IT IS SO ORDERED.